**Melissa BATES and John Mahoney, Plaintiffs,**

**v.**

**Frank BIGGER, John Thompson, Ray McDonald, Dennis Barry, Richard Onorati and Richard Denehy, all sued in their individual capacities, Defendants.**

**No. 01 Civ. 0403(WCC).**

United States District Court, S.D. New York.

March 12, 2002.

Law Offices of Michael H. Sussman, Attorneys for Plaintiffs, Goshen, NY, Christopher D. Watkins, Of Counsel.

Burke, Miele & Golden, LLP, Attorneys for Defendants Frank Bigger, John Thompson, Ray McDonald, Dennis Barry and Richard Onorati, Goshen, NY, Patrick T. Burke, Michael K. Burke, Of Counsel.

MacVean, Lewis, Sherwin & McDermott, P.C., Attorneys for Defendant Richard Denehy, Middletown, NY, James V. Galvin, Of Counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Melissa Bates and John Mahoney bring the instant action pursuant to 42 U.S.C. § 1983 against officers of the Orange County Sheriff's Department alleging that defendants retaliated against them for exercising their First Amendment rights of intimate association and access to the courts. The Complaint names as defendants Sheriff Frank Bigger, Undersheriff John Thompson, Chief Ray McDonald, Captain Dennis Barry, Lieutenant Richard Onorati (collectively the "department defendants") and Sergeant Richard Denehy, each in his individual capacity. Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56.[1] For the reasons that follow, defendants' motion is granted in its entirety.

## BACKGROUND

The following facts are undisputed except where otherwise indicated. Plaintiffs are deputy sheriffs in the Orange County Sheriff's Office in Goshen, New York (the "Sheriff's Office"). In late 1999, while both were married and living with their respective spouses, plaintiffs began a romantic, extra-marital relationship. (Complt. ¶ 9; Bates Dep. at 15–16.) The Sheriff's Office does not have any rules prohibiting officers from dating one another. (Pls. Mem. Opp. Summ. J. at 2.) Both

---

1. The instant motion for summary judgment was initially filed on behalf of defendants Bigger, Thompson, McDonald, Barry and Onorati. This Court subsequently received a letter stating that defendant Denehy also wished to join in the motion.

plaintiffs commenced divorce proceedings against their spouses sometime in the year 2000.[2] Before March of 2000, plaintiff Mahoney and his supervisor, defendant Denehy, were personal friends and enjoyed a good professional relationship. (Defs. Rule 56.1 Stmt. ¶ 4.) However, beginning around the time that he learned of plaintiffs' relationship, Denehy began to publicly berate plaintiffs. (Id. ¶ 5; Complt. ¶ 12; Bates Dep. at 17.) For example, plaintiffs recount one occasion at a local bar in March of 2000 when Denehy told other officers that he disapproved of plaintiffs' relationship and made insulting and vulgar comments about Bates. (Pls. Mem. Opp. Summ. J. at 3.) In the summer of 2000, as Denehy continued to make negative comments about Bates to third parties, Mahoney voiced his concerns about Denehy's behavior to Barry, who told him to document and report any future incidents. (Id. at 4.)

The tension between Denehy and plaintiffs erupted at the wedding of a colleague on August 19, 2000 (the "Ring wedding"). According to plaintiffs, Denehy began the confrontation by grumbling something under his breath after Mahoney flicked ice across the table at another deputy. (Mahoney Dep. at 49.) When Mahoney responded with "fuck you Rich," Denehy allegedly became enraged, threatened to "kick [Mahoney's] ass all over the park," and made negative comments about Mahoney's parenting. (Id. at 5; Mahoney Dep. at 49–50.) After this angry exchange, plaintiffs left the Ring wedding in order to avoid a physical confrontation. (Mahoney Dep. at 50.) As they left, Denehy allegedly yelled after them: "Go ahead and leave with your whore." (Id. at 51.)

Mahoney called Barry at his home the next day to report the confrontation at the Ring wedding. (Pls. Mem. Opp. Summ. J. at 5.) Denehy contacted Thompson the same day to give his account of the incident. (Id.) Upon returning to work on Monday, August 20th, Mahoney was called to the Sheriff's Office for a meeting to discuss the Ring wedding incident. At the meeting, Denehy, Bates and Mahoney were each interviewed by Thompson, McDonald and Barry while Bigger sat in. (Defs. Rule 56.1 Stmt. ¶ 10; Pls. Reply Defs. Rule 56.1 Stmt. ¶ 10.) In addition to discussing the events at the Ring wedding, plaintiffs reported the denigrating comments that Denehy had been making, and discussed their impact on Bates in particular. (Defs. Rule 56.1 Stmt. ¶ 11.) Mahoney discussed the recent tension that existed between Denehy and himself (Mahoney Dep. at 69–70), and Bates explained that she was humiliated by Denehy's treatment and wanted it to stop. (Bates Dep. at 36.) Denehy admitted to making disparaging comments about Bates. (Thompson Dep. at 16.) For his actions, Denehy was written up and received a counseling letter. (Id. at 18.)

At the time of the meeting, Denehy was Mahoney's immediate superior officer and Bates, although working under a different supervisor, was at a post contiguous to Denehy's. All three worked the day shift. (Defs. Rule 56.1 Stmt. ¶ 9.) According to plaintiffs, they never requested a shift transfer. (Pls. Mem. Opp. Summ. J. at 6; Thompson Dep. at 19; Bigger Dep. at 21.) On August 24, 2000, plaintiffs both received twenty-one-day notices of transfer from the day shift to the three-to-eleven

2. The exact date that plaintiffs' divorce proceedings began is unclear. Mahoney moved out of his marital residence permanently in July 2000 (Mahoney Dep. at 33), and Bates was living with her husband, although legally separated, in March of 2000. (Bates Dep. at 61.) Her divorce was not finalized until November 2001. (Bates Dep. at 4.) Plaintiffs have resided together since February 2001. (Pls. Mem. Opp. Summ. J. at 2.)

evening shift. (Pls. Mem. Opp. Summ. J. at 8.) After the transfer, Mahoney would no longer work under Denehy's immediate supervision[3] and Bates would no longer work the same hours as Denehy at her contiguous post. (Defs. Rule 56.1 Stmt. ¶ 12; Mahoney Dep. at 77–78.) Defendants claim that they initiated these shift transfers in order to separate plaintiffs from Denehy, and because transferring Denehy would create administrative difficulty as a result of Denehy's superior position. (Burke Aff. ¶¶ 13, 15.)[4] Plaintiffs, however, maintain that they were given no explanation for the transfer.[5] (Pls. Mem. Opp. Summ. J. at 8.) Plaintiffs immediately complained about their transfer to the evening shift. According to Mahoney, the shift interfered with his hours of visitation rights with his children. (Mahoney Dep. at 25.) Bates complained that the shift transfer was a form of punishment. (Bates Dep. at 37.) On the evening of August 24th, after receiving their shift transfer notices, Mahoney filed a criminal complaint with the New York State Police (the "criminal complaint") concerning Denehy's conduct at the Ring wedding.[6] The case was never prosecuted. (Mahoney Dep. at 82.)

Plaintiffs claim that Denehy continued to harass them on a daily basis over the twenty-one days before their transfers became effective. (Pls. Mem. Opp. Summ. J. at 9.) Denehy hassled Mahoney whenever he entered the Communications area where Bates worked and also yelled things at Bates. (*Id.*; Cardinale Dep. at 13.) On August 25, 2000, the day after Mahoney filed the criminal complaint, Denehy made an entry in a log book falsely stating that he had informed Bates of a shift in mandatory overtime. (Pls. Mem. Opp. Summ. J. at 8.) Denehy claims that he made the entry intending to inform Bates of the shift in the future, and admits that he understood that Bates was subject to discipline if she failed to comply with mandatory overtime. (Denehy Dep. at 32–33.) Bates, however, never received any discipline with respect to mandatory overtime. (Onorati Dep. at 10.) Although Bates told Onorati about the false entry, Denehy was never disciplined for this conduct. (*Id.* at 7.)

In another incident of alleged harassment by Denehy in early September 2000, Denehy issued a notice requiring all deputies to request permission prior to returning from the road to the Sheriff's Office, although permission was not previously required. (Watkins Aff., Ex. 6.) According to the testimony of another officer, Denehy instituted this procedure to prevent Mahoney from bringing lunch to Bates during the course of the day. (Cardinale Dep. at 10.) Denehy stopped enforcing the procedure after plaintiffs' transfers. (*Id.*)

---

3. Plaintiffs argue that although Mahoney was removed from the shift over which Denehy had immediate supervision, defendants took no action to prevent Denehy from working overtime, thus sometimes allowing Denehy to supervise Mahoney and to overlap with Bates's shift. (Pls. Mem. Opp. Summ. J. at 8.)

4. Plaintiffs argue that the true reason that defendants effected this transfer was in retaliation for their complaints regarding Denehy and their intimate association. (Pls. Reply Defs. Rule 56.1 Stmt. ¶ 12.)

5. Mahoney states that he was eventually told that he was transferred to the evening shift so that he wouldn't be working at the same time as Denehy. (Mahoney Dep. at 78.)

6. Mahoney alleges that the Union President Paul Arteta later told him that defendants were furious over his filing of the criminal complaint. (Pls. Mem. Opp. Summ. J. at 9–10.)

At some time prior to the time that plaintiffs' transfer orders went into effect, Denehy transferred Mahoney to a post at the Department of Social Services ("DSS") in Newburgh for one week.[7] (Pls. Mem. Opp. Summ. J. at 9.) Apparently, this position was considered a less desirable post to which deputies were assigned if they were new, disliked, or being punished for an infraction. (*Id.;* Dunn Dep. at 22.)

On September 25, 2000, after their transfers had taken effect, plaintiffs filed union grievances complaining that they considered the shift transfers unjust, requesting that they be returned to a work schedule that did not conflict with their personal or professional lives, and seeking the elimination of any possibility of future harassment. (Watkins Aff., Ex. 5.)

After plaintiffs filed their grievances, on October 4, 2000,[8] Mahoney received a letter of ten-day suspension for insulting comments made about Bigger to Investigator Baxter on September 24, 2000.[9] (*Id.* Ex. 7.) The suspension was based on a written report that Baxter made to McDonald detailing the denigrating remarks that Mahoney made about Bigger. According to Baxter, after he had repeated Mahoney's comment to other officers, Denehy informed him that Bigger was upset and that McDonald wanted him to report the conversation in writing. (Baxter Dep. at 30.) Although Baxter repeated this comment in public, he was never disciplined. (Pls. Mem. Opp. Summ. J. at 10–11.) After Mahoney filed a grievance for the suspension, claiming that it was in retaliation for his complaints against De-

nehy, (*id.* at 10), Thompson conducted a hearing on the suspension. During the hearing, Mahoney explained that he made the comment while in a closed police car, and that he was merely repeating someone else's comment that he found amusing. (*Id.*) Thompson allegedly asked Mahoney how long his divorce would take and stated that he wished Denehy and Mahoney would just go outside and "kick the shit out of each other and get it over with already." (*Id.;* Mahoney Dep. at 110.) At the conclusion of the hearing, Mahoney was told that he wouldn't be suspended, but that a letter would be placed in his file. (Mahoney Dep. at 110–11.)

On October 10, 2000, Mahoney was notified by McDonald that he had been removed from his position on the elite Narcotics Entry team, a special unit within the Sheriff's Department. (Pls. Mem. Opp. Summ. J. at 11.) Before his removal, Mahoney had been moved back from the point position to a lower position, allegedly in order to separate him from Denehy and make for a safer working environment. (Burke Aff. ¶ 19.) Denehy's position on the team was also moved at that time. (Baxter Dep. at 22.) According to defendants, Mahoney was ultimately removed from the team because he was discovered copying the rosters of all the search teams in order to support a claim that his removal from the point position was a form of harassment. (Burke Aff. ¶¶ 21–22.) After copying the files, Mahoney removed them from the office and placed them in Bates's car, which was apparently a breach of security. (*Id.*) After this event, Mahoney received notice from McDonald that he

---

7. Barry stated that he instructed Denehy to assign Mahoney to a week-long post at Newburgh DSS in order to keep the two of them separated. (Barry Dep. at 27–28.)

8. Plaintiffs state that this letter was received on September 27, 2000. (Pls. Mem. Opp. Summ. J. at 10.) However, the document

that plaintiff has submitted to this Court is dated October 4, 2000. (Watkins Aff., Ex. 7.)

9. Mahoney apparently called the Sheriff an "E.T. Snot Eyes Looking Mother Fucker." (Watkins Aff., Ex. 8.)

would be removed from the team. (Mahoney Dep. II at 37.) Mahoney maintains that he was never told the reason for his removal. (*Id.* at 36.)

On October 25, 2000, plaintiffs filed "marital status" and "retaliation" complaints (the "discrimination complaints") with the Orange County Department of Personnel ("OCDP") (Watkins Aff., Exs. 10, 11.) In response, the OCDP questioned a number of officers with respect to plaintiffs' complaints. Plaintiffs claims were ultimately rejected. (Defs. Reply Mem. Supp. Summ. J. at 10.)

On October 31, 2000, Mahoney was transferred to a day-shift assignment [10] at the Newburgh DSS on a permanent basis. (Burke Aff. ¶ 17, Ex. M; Mahoney Dep. II at 27.) Bates was transferred to an "equally undesirable" day-shift assignment at the probation department in Goshen on December 13, 2000.[11] (Pls. Mem. Opp. Summ. J. at 12; Burke Aff., Ex. O.) Mahoney claims that the position at the Newburgh DSS once again made Denehy his immediate supervisor,[12] although both

were located in different parts of the County. (Mahoney Dep. II at 43.)

Plaintiffs also claim that defendants harassed them by labeling them as "sick leave abusers." (Complt. ¶¶ 22, 25.) In December of 2000, plaintiffs were notified by Thompson that they were being classified as sick leave abusers.[13] (Watkins Aff., Ex. 15.) Bates had received a similar notice in June of 2000. The letters state that as a result of this classification, future sick leave usage would need to be supported with a doctor's certification or else sick leave would be denied and classified as unpaid hours. (*Id.*) According to defendants, plaintiffs' classification as sick leave abusers was not only based on the amount of hours that plaintiffs claimed, but also the pattern of days taken off. Defendants claim that each plaintiff's sick days coincided with the days that the other had off.[14] Plaintiffs maintain that Thompson did not follow proper procedure in notifying them of their classification as sick leave abusers, and did not inform them of the reason they were labeled as such. (Pls. Mem. Opp.

---

**10.** After this shift, Mahoney worked the day-shift (from nine to five) four days a week, and worked the twelve-to-eight shift on Tuesdays. (Mahoney Dep. at 27.)

**11.** Plaintiffs suggest that these later shift transfers were made in retaliation for filing their discrimination complaints with OCDP. (Pls. Mem. Opp. Summ. J. at 12.) Plaintiffs misstate the evidence by claiming that Barry himself testified that the filing of grievances was the true reason for plaintiffs' transfers. However, in the testimony to which plaintiffs' cite, Barry is asked:

WATKINS: Was [Mahoney] transferred because he filed a grievance?
BARRY: No.
WATKINS: Was his transfer related to the fact that he filed a grievance.
BARRY: I don't remember.
Defendants, on the other hand, point out that these transfers to the day shift were made soon after plaintiffs had filed grievances complaining that the evening shift interfered with their personal lives. (Defs. Reply Mem. Supp. Summ. J. at 11; Watkins Aff., Exs. 10, 11.)

**12.** The memo submitted by plaintiffs informing Mahoney of his shift transfer to the Newburgh DSS states that his immediate supervisor would be Sergeant Lloyd. (Watkins Aff., Ex. 12.)

**13.** The notice to Mahoney states that he was being classified as a sick leave abuser because he used 63 hours of sick leave in the five-month period between July 7th and December 8th, 2000. Bates's notice states that she used 44.5 hours in the same period. (Watkins Aff., Ex. 15.) Both plaintiffs had positive sick leave balances at the time they received these notices. (*Id.*)

**14.** Mahoney admits that on one occasion, he and Bates took a day trip to Mystic, Connecticut after calling in sick. (Mahoney Dep. at 94–95.)

Summ. J. at 13.) Other than receiving these notices and having them placed in their files, plaintiffs do not allege that any additional official action was taken against them as a result of their classification as sick leave abusers. On June 1, 2001, plaintiffs received letters from Thompson stating that their usage of sick leave was now within the guidelines of the department, and that their classification as sick leave abusers would be withdrawn. (Defs.Mem.Supp.Summ. J., Ex. P.)

Finally, Mahoney claims that defendants retaliated against him by denying him reassignment to the Investigations Unit after promising to move him back when a spot became available. (Pls. Mem. Opp. Summ. J. at 14.) On February 28, 2001, Mahoney wrote a letter to Bigger stating that he was aware of a vacancy on the Investigations Unit, and reminding Bigger of the December 1999 promise to reassign him. (Watkins Aff., Ex. 17.) Despite this request, defendants did not reassign Mahoney to the Investigations Unit.

Plaintiffs maintain that the foregoing actions were taken by defendants to harass them for their relationship with one another, which they claim is protected by the right of intimate association under the First Amendment, and in retaliation for filing grievances and complaints with the OCDP. (Pls. Mem. Opp. Summ. J. at 15.)

## DISCUSSION

### I. Standard For Motion For Summary Judgment

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254 (E.D.N.Y. 1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

### II. Intimate Association Claim

Plaintiffs assert that their relationship is protected under the First Amendment, and that defendants' actions unduly interfered with their constitutional right to engage in such a relationship. In support of their claim, plaintiffs refer to the Supreme Court decision in *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In that case, the Court explained that the Constitution protects "certain kinds of highly personal relationships ... from unjustified interference by the State." *Id.* at 618, 104 S.Ct. 3244. Defendants respond that the Constitution does not protect the type of "intimate association" in which plaintiffs were involved, and, even assuming their relationship was protected, no evidence exists to suggest that defendants took any official action against plaintiffs as a result of this relationship. Because analysis of this

claim applies differently to Denehy than to the department defendants, we consider the two separately.

### A. *Intimate Association Claim as Applied to the Department Defendants*

■ Plaintiffs allege that the department defendants took actions that unduly intruded on their right to intimate association [15] and maintain that evidence in the record raises a genuine issue of fact as to whether the department defendants' actions were taken in retaliation for plaintiffs' relationship. In support of this claim, plaintiffs point to the following pieces of evidence: 1) McDonald told Denehy in April of 2000 that he had observed plaintiffs' cars parked outside a third party's house and inquired whether Mahoney had left his wife; 2) during Mahoney's October 2000 suspension hearing, Thompson asked Mahoney how long his divorce would take to become final; 3) the department defendants transferred plaintiffs to undesirable posts and removed Mahoney from the Narcotics Entry team without rational explanation, while, at the same time, failing to discipline Denehy for his actions against plaintiffs; 4) the department defendants maintain that plaintiffs were transferred to avoid conflict with Denehy, but failed to curtail Denehy's ability to work overtime; 5) the department defendants cannot offer a persuasive explanation as to why they sought Mahoney's suspension for comments he repeated about Bigger while failing to discipline Baxter for repeating the same comments; and 6) Thompson failed to follow established procedure in notifying plaintiffs that they were deemed "sick leave abusers." (Pls. Mem. Opp. Summ. J. at 19.) Plain-

tiffs argue that a jury could find that these actions were taken by the department defendants in violation of their First Amendment right to intimate association.

Considering the evidence that plaintiffs have advanced in support of this claim, we conclude that no rational jury could find that the department defendants' actions were done in retaliation for plaintiffs' relationship. There is simply no evidence in the record to suggest that these allegedly adverse acts had anything at all to do with an intention to interfere with or retaliate for plaintiffs' relationship. First, McDonald and Thompson's alleged inquiries as to whether Mahoney left his wife or finalized his divorce are both immaterial, benign questions. Although plaintiffs may have found these inquiries inappropriate, there is no indication that they reflected any disapproval of plaintiffs' relationship. Nor can plaintiffs establish that by asking questions about Mahoney's relationship with his wife, Thompson and McDonald interfered with plaintiffs purported right to intimate association.

In addition, other than plaintiffs' unsubstantiated assertion, they have presented no evidence suggesting a nexus between plaintiffs' relationship and the actions taken following the Ring wedding incident. Plaintiffs insist that because department defendants have offered no persuasive explanation for plaintiffs' shift transfers, classification as sick leave abusers or the disciplinary action taken against Mahoney for his comments about Bigger, a jury could reasonably find that these actions were done in retaliation for their relationship. We disagree. Plaintiffs cannot survive summary judgment by relying on mere conclusory statements with respect to defendants' liability. Instead, they must point to specific evidence in the rec-

---

15. At this point, it is not necessary to consider whether plaintiffs' relationship was protected under the First Amendment because we dis-

pose of this claim on other grounds. For a more in depth discussion of this issue, see *supra* Part II.B.1.

ord that supports their claim. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548 (summary judgment warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof). In order to succeed on their intimate association claim against department defendants, plaintiffs must point to evidence that supports their assertion that the conduct was motivated by or substantially caused by plaintiffs' protected relationship. *See, e.g., Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir.1994) (discussing the requirements for establishing a free speech retaliation claim under § 1983). While plaintiffs have pointed to actions which they consider adverse, they have not come forward with any evidence showing a connection between these actions and the department defendants' view of their relationship. Summary judgment is therefore granted with respect to plaintiffs' intimate association claim against the department defendants.

## B. *Intimate Association Claim as Applied to Denehy*

Unlike the department defendants, Denehy's conduct towards plaintiffs clearly resulted from his negative feelings with respect to their relationship. Therefore, in order to determine whether plaintiffs have alleged facts sufficient to support a freedom of association claim against Denehy, it is necessary to consider the contours of that right in order to determine whether Denehy has in fact committed a constitutional violation.

### 1. *Relationships Entitled to Constitutional Protection*

In *Roberts*, the Supreme Court recognized a constitutional right to intimate association and explained that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." [16] *Roberts*, 468 U.S. at 617–18, 104 S.Ct. 3244. The Court went on to describe the types of "highly personal relationships" that were entitled to constitutional protection, recognizing that there were limitations on the scope of this right. *Id.* at 618–19, 104 S.Ct. 3244. As the Court explained, personal affiliations that exemplify the considerations underlying the intimate association right "are those that attend the creation and sustenance of a family—marriage, the raising and education of children, and cohabitation with one's relatives." *Id.* at 619, 104 S.Ct. 3244 (internal citations omitted). According to the Court, the personal associations entitled to constitutional protection share the attributes of "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.*

In *Board of Dir. of Rotary Int'l v. Rotary Club of Duarte*, the Court emphasized that although the "precise boundaries" of the intimate association right were unclear, constitutional protection was not restricted to relationships among family members. 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). Instead, "the First Amendment protects those relationships ... that presuppose 'deep attachments and commitments to the necessarily

---

**16.** The *Roberts* Court also recognized a second component of the right of association which protects an individual's right to associate with others "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618, 104 S.Ct. 3244.

few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life." *Id.* (quoting *Roberts,* 468 U.S. at 619–20, 104 S.Ct. 3244). The Second Circuit, in considering the breadth of the intimate association right, recently observed "[w]hether the [intimate association] right extends to [relationships outside the family] depends on the extent to which those relationships share the characteristics that set family relationships apart—small, select, and secluded from others." *Sanitation and Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 996 (2d Cir.1997).

Neither party has cited, and this Court has not uncovered, any controlling authority involving the right of intimate association with respect to the type of relationship in which plaintiffs are involved. We note first that the precise nature of their relationship is difficult to define. When Denehy's conduct of which plaintiffs complain began in March of 2000, both were married and living with their spouses and Mahoney with his children. Mahoney moved out of his marital home in the summer of 2000. While plaintiffs continued to have "an ongoing, exclusive, romantic relationship" during this time, they did not reside together until February of 2001. (Pls. Mem. Opp. Summ. J. at 17.) Bates admittedly did not finalize her divorce until November of 2001. (Bates Dep. at 4.) The nature of plaintiffs' association during the relevant time frame could therefore be defined as a dating relationship, albeit an extra-marital, adulterous [17] one. Plaintiffs' relationship may have been "highly personal," and displayed attributes of "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts,* 468 U.S. at 620, 104 S.Ct. 3244. However, in the time frame that the complained of events occurred, their association plainly failed to exemplify the considerations that "attend the creation and sustenance of a family." *Id.*[18] Instead, plaintiffs' relationship was of the sort that serve to break families apart—and this is apparently what upset Denehy. (Mahoney Dep. at 39.) It is therefore open to debate whether plaintiffs' relationship enjoys constitutional protection under the right of intimate association. We need not decide that question here, however, because even assuming plaintiffs' relationship was constitutionally protected, the lack of clarity on the issue gives Denehy a solid defense of qualified immunity.[19]

### 2. *Qualified Immunity*

 A defendant is entitled to qualified immunity if his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct.

---

17. Plaintiffs suggest that defendants mischaracterize their relationship as adulterous. (Pls. Mem. Opp. Summ. J. at 16.) However, the fact remains that both were married to their respective spouses through what appears to be the duration of the conduct referred to in the Complaint.

18. Their relationship is also not the "kind[] of personal bond[] [that has] played a critical role in the culture and traditions of the Na-

tion." *Roberts,* 468 U.S. at 618–19, 104 S.Ct. 3244.

19. Neither party discusses the qualified immunity defense in their moving papers. However, Denehy pled qualified immunity as an affirmative defense in his Answer to plaintiffs' Complaint. (Denehy Answer ¶ 9.) In addition, both parties have fully briefed the issue of whether plaintiffs' association is entitled to constitutional protection.

2727, 73 L.Ed.2d 396 (1982).[20] A rule is "clearly established" if "[t]he contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The legal right should not be examined "in the abstract," but must be "more particularized" to be actionable under § 1983. *Cameron v. Seitz,* 38 F.3d 264, 274 (6th Cir.1994) (quoting *Creighton,* 483 U.S. at 640, 107 S.Ct. 3034). In the instant action, whether plaintiffs' relationship is entitled to protection under the First Amendment right to intimate association is not "clearly established." As stated above, this Court has found no authority dealing with the application of the right to the type of association in which plaintiffs are involved. The Second Circuit recently explained that "the nature and extent of [the right to intimate association] is hardly clear." *Adler v. Pataki,* 185 F.3d 35, 42 (2d Cir. 1999). Moreover, consideration of other circuit court decisions on the scope of the intimate association right also failed to uncover any clear authority on the subject. For example, the Sixth Circuit has held that there is no clearly established law extending constitutional protection to dating relationships or to engagements. *See Cameron,* 38 F.3d at 275–76. We therefore hold that Denehy's conduct did not violate any clearly established constitutional rights of which a reasonable person

would have known, and he is thus entitled to a defense of qualified immunity.[21] Summary judgment is granted with respect to plaintiffs' intimate association claim against Denehy.

### III. *Right to Petition For Redress of Grievances Claim*

■ Plaintiffs claim that defendants have engaged in punitive actions against them in retaliation for the filing of discrimination complaints,[22] which signaled their intent to seek access to the courts. Defendants respond that plaintiffs' complaints did not address a matter of public concern and are therefore not protected under the First Amendment. Furthermore, they argue that none of defendants' actions were aimed at preventing plaintiffs' from pursuing their legal claims.

■ In order for speech to be protected under the First Amendment, it must relate to "any matter of political, social or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Therefore:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency

**20.** Plaintiffs may argue that Denehy was not performing a discretionary function, a condition of qualified immunity, when he made disparaging comments about Mahoney and Bates. However, although relevant to Denehy's state of mind towards plaintiffs' relationship, these off-duty comments cannot form a basis for relief under § 1983. *See, e.g., Pitchell v. Callan,* 13 F.3d 545 (2d Cir.1994).

**21.** The department defendants' actions would also have been entitled to a qualified immunity defense had the Court decided that there

was sufficient evidence to support a right of intimate association claim against them.

**22.** It is unclear whether plaintiffs' claim under this theory involves retaliation after the filing of their OCDP discrimination complaints on October 25, 2000, or whether they also claim retaliation by defendants after they filed union grievances on September 25, 2000. However, the following analysis applies to both types of petitions.

allegedly in reaction to the employee's behavior. *Id.* at 147, 103 S.Ct. 1684. The Second Circuit has held that the right to petition the government for the redress of grievances is generally subjected to the same constitutional analysis as the right to free speech. *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir. 1993); *see also Rucci v. Thoubboron*, 68 F.Supp.2d 311, 328 (S.D.N.Y.1999) (Conner, J.). Therefore, plaintiffs' discrimination complaints are not protected by the First Amendment, and are thus not the proper subject for a retaliation claim under § 1983, unless they involve matters of public concern.[23]

■■■ Plaintiffs argue that their internal and formal complaints concerning intimate association and marital discrimination were tantamount to their accessing the courts and therefore constituted protected expression. (Pls. Mem. Opp. Summ. J. at 20.) However, to decide whether plaintiffs' actions enjoy protection under the First Amendment, the Court must look at the substance of the complaints themselves to determine whether they address a matter of public concern. *See Rucci*, 68 F.Supp.2d. at 328 ("The public concern requirement is clearly established, and there is no reason that we should abandon that requirement simply because plaintiff communicated through a more formalized grievance process."). The question of whether an "employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. The fundamental question in deciding this motion is whether plaintiffs "were seeking to vindicate personal interests or bring to light a matter of political, social, or other concern to the community." *Lennon v. Finegan*, No. 97 Civ. 9394, 1999 WL 1704436, at *6 (S.D.N.Y. July 21, 1999) (citation omitted).

Plaintiffs first filed internal grievances on September 25, 2000 after they were transferred to the evening shift. The grievances stated that they were unjustly transferred after bringing to light their problems with Denehy, and that the transfers interfered with their personal and professional lives. (Watkins Aff., Ex. 5.) By filing the grievances, plaintiffs explicitly sought a return to the day shift and a cessation of Denehy's harassment. (*Id.*) These grievances are not protected under the First Amendment because they involved only an internal departmental dispute and did not relate to any matter of concern to the community. *See, e.g., White Plains Towing Corp.*, 991 F.2d at 1058 (personal desire for a particular assignment is not a matter of public concern); *Rucci*, 68 F.Supp.2d at 328 (complaint did not address a matter of public concern because "plaintiff was simply upset with the way her superior officers treated her"); *see also Cahill v. O'Donnell*, 75 F.Supp.2d 264, 272 ("A public employee's speech on matters of purely personal interest or internal office affairs does not constitute a matter of public concern....") (citation omitted).

■■■ Like their internal grievances, plaintiffs' discrimination complaints ad-

---

**23.** In their opposition papers, plaintiffs appear to argue that in addition to retaliating against plaintiffs for their attempts to petition for redress of grievances, defendants' actually hindered their right to access the courts. (Pls. Mem. Opp. Summ. J. at 21–22.) The record contains no evidentiary support for this allegation. Nowhere is it even suggested that defendants took actions aimed at obstructing plaintiffs' access to the legal system. We therefore analyze this claim solely as one of retaliation for petitioning to redress grievances.

dressed purely personal matters relating to their dissatisfaction with defendants' treatment of them in the workplace. Although targeted at alleged discrimination "[e]ven as to an issue that could arguably be viewed as a matter of a public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight." *White Plains Towing Corp.*, 991 F.2d at 1059. Taken in context, it is clear that plaintiffs' discrimination complaints involved personal grievances relating to their own employment interests. There is no indication that plaintiffs sought to expose or even address a matter that would be of concern to the community. Because plaintiffs were speaking "not as [citizens] upon matters of public concern, but instead as [employees]," *Connick*, 461 U.S. at 147, 103 S.Ct. 1684, their speech is not entitled to protection under the First Amendment. Therefore, defendants' motion for summary judgment on this claim is granted.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiffs' Complaint is dismissed with prejudice.

SO ORDERED.